77 P.3d 378 (2003)
In the Matter of the Petition of CITY OF LYNNWOOD, a Washington Municipal Corporation, to Acquire by Condemnation Certain Real Property for Public Use as Authorized by Ordinance 2413,
City of Lynnwood, a Washington municipal corporation, Respondent,
v.
Video Only, Inc., a Washington corporation, Appellant.
No. 51203-0-I.
Court of Appeals of Washington, Division 1.
October 6, 2003.
*380 Kinnon William Williams, Catherine Cecily Clark, Williams Clark PSC, Kenmore, WA, for Appellant.
Greg Alan Rubstello, Jeffrey Burton Taraday, Ogden Murphy Wallace, Seattle, WA, for Respondent.
*379 KENNEDY, J.
The City of Lynwood wants to build a convention center that will function as multi purpose, regional, tourism-related facility under RCW 35.57.020 and a multi-purpose community center under RCW 35.59.010. To accomplish this, the City adopted an ordinance creating the South Snohomish County Public Facilities District (PFD) for the purpose of acquiring, constructing, financing and operating a regional center, which will be named the Lynwood Convention Center. The City then entered into an agreement with the PFD, affirming the ordinance and agreeing to undertake activities in support of the PFD, including the acquisition of property for the project by eminent domain.
Before the City commenced the condemnation action that is the subject of this appeal, the PFD purchased the aging Alderwood Village Shopping Center (Shopping Center) when it was made available for sale by its owners. When the PFD purchased the Shopping Center, most of the buildings there were subject to existing leases. With the purchase, the PFD stepped into the shoes of the sellers and became a landlord with respect to these leases.
The Shopping Center's parking lot will be necessary to provide most if not all of the 484 parking spaces that will be required for Phase I of the regional centerthe convention center proper and the exhibition hall. By the time that the PFD reaches Phase III of the project, virtually all of what is now the Shopping Center will be required for expanded facilities and additional parking, including a multi-story parking garage. In the meantime, the PFD intends to use the rental income from the Shopping Centerestimated to be some $500,000 per yearto help finance Phases I and II of the project. The PFD has not granted any renewals of existing leases, and refused to renew one lease when it was asked by the tenant to do so. But including potential renewals, at least one of the leases could last through the year 2023, if not sooner terminated by one means or another.
Video Only, Inc., owns and its business is located on property adjacent to the Shopping Center that the City wishes to condemn in order to acquire land for Phase I of the project. Video Only does not dispute that these are public uses, that the public interests require the project and that its land is necessary for the purpose of Phase I of the project. But it contends that PFD's continued operation of the Shopping Center is beyond the legislative authority granted to public facilities districts and constitutes an impermissible means of financing a public project, that the Shopping Center is not being put to a public use and will not be put to a public use for an unreasonably long period of time, and that the continued operation of the Shopping Center is so substantial a part of the financing as to taint the project in its entirety and undermine the validity of the condemnation of Video Only's land.
The City counters that an action to condemn private property for a public use is a proceeding in rem, and that when jurisdiction is based on property, the resulting judgment can only affect the property that has been brought before the court, here, Video Only's property and not the adjacent Shopping Center. The City contends that Video Only's arguments constitute a collateral attack on the PFD's purchase and use of the Shopping Center, which the court's in rem jurisdiction will not support.
The trial court found the City's arguments persuasive. The court concluded that it *381 lacked subject matter jurisdiction to address whether the Shopping Center is being put to a public use because the Shopping Center is not being condemned, but that if the court did have subject matter jurisdiction, the PFD's continued operation of the Shopping Center did not taint the public use for which it was acquired, namely parking for the convention center and future expansion of the multi-use facility, which are lawful purposes. The court also concluded that the use being made of the Shopping Center did not taint the public use for which Video Only's property was being acquired. Accordingly, the court found that the use for which the City sought to acquire and condemn Video Only's property is a public use, that Video Only's property is necessary for the public use contemplated in the petition, and that the public interest requires its acquisition, and entered its order of public use and necessity. The court directed the matter to be set for trial in order to determine just compensation.
This appeal followed.[1]

I
We first address the trial court's subject matter jurisdiction for purposes of condemnation actions. Eminent domain is one of several kinds of proceedings in which courts exercise in rem jurisdiction.[2] Courts may have jurisdiction to enter judgment with respect to property or things located within the boundaries of the state, even if personal jurisdiction has not been obtained over the persons affected by the judgment. Tegland, Karl B., WASHINGTON PRACTICE SERIES, CIVIL PROCEDURE, § 5.1. The PFD is not a party to this condemnation action, and Video Only successfully resisted bringing the PFD into the lawsuit when the City sought to do so. The PFD purchased the Shopping Center outright; the City did not condemn it. The "res" (thing) for purposes of this condemnation action is Video Only's land, not the Shopping Center property. Certainly, the trial court lacked subject matter jurisdiction to order the PFD to take any action with respect to the Shopping Center or to cease any activity with respect to that property. But that is not the kind of relief that Video Only was seeking.
The Shopping Center and its operation by PFD as an interim financing device is an integral part of the Lynwood Convention Center project as a whole, and it is the project as a whole that must pass constitutional muster in a condemnation action. This conclusion is implicit in our Supreme Court's rulings with respect to eminent domain proceedings, to which we look for guidance.
For example, in In re Petition of City of Seattle (Westlake I), 96 Wash.2d 616, 627-28, 638 P.2d 549 (1981) the court held that "where the purpose of a proposed acquisition is to acquire property and devote only a portion of it to truly public uses, the remainder to be rented or sold for private use, the project does not constitute public use." (Emphasis ours). But in State ex rel. Washington State Convention and Trade Center v. Evans, 136 Wash.2d 811, 820, 966 P.2d 1252 (1998) the court said that because "[t]he project could go forward without private participation in entirely the same manner, except that three stories of vacant space would lie unused underneath" the expanded exhibit space, "the private development in this vacant space is a separable component of the expansion project. [The private developer's] participation is a means to an end, but it is not an end in and of itself." (Emphasis ours).
In In re Petition of City of Seattle (Westlake II), 104 Wash.2d 621, 707 P.2d 1348 (1985) the City of Seattle successfully condemned the same land for public park purposes that it had tried unsuccessfully to condemn in Westlake I. In response to the Supreme Court's decision in Westlake I that the City could not condemn any of the property for the Westlake Project because the project was to include both a public park and *382 186,000 square feet of retail and cinema space that the City would lease to private parties, the City devised a new means of accomplishing the same goal. It had already acquired some of the property on which the proposed retail center was to be built. It divested itself of that property by selling it to a developer on the condition that the developer would follow the City's architectural plans for the project as previously conceived. Then, it sought to condemn the same property that was necessary for the public park that had been part of the project as originally conceived. The condemnee objected to the condemnation of its land for purposes of the public park. Similarly to Video Only in the instant case, the condemnee argued that the park was such an integral and inseparable part of the continuing private development on the adjacent property as not to be a truly public use within the meaning of article 1, § 16 of the Washington Constitution. Westlake II, 104 Wash.2d at 623, 707 P.2d 1348. The Supreme Court rejected the argumentnot on grounds that the court lacked subject matter jurisdiction to consider the argumentbut on the following grounds:
Although [the condemnee] is correct in stating that the City is continuing to pursue the long-standing Westlake Project objectives, the City is now doing so pursuant to legal authority. The City is now condemning property for only one purpose to establish a park. Although the City is pursuing other activities adjacent to the proposed park, those activities do not involve the use of the City's power of eminent domain. Insofar as that power is concerned, there is a total absence of mixing of public and private uses.
Westlake II, 104 Wash.2d at 625, 707 P.2d 1348.
We conclude that the trial court had subject matter jurisdiction to consider Video Only's contentions in this case because they relate to the project as a whole. A trial court should not put on blinders, as it were, to the project as a whole in adjudicating public use and necessity for the condemnation of various component parts of the project. It is not at all unusual for public bodies to acquire some of the properties needed for a particular project by condemnation and others by purchase. It is only by considering the project as a whole that a court can properly adjudicate whether a component parcel is being condemned for a truly public use. Accordingly, the trial court erred in its determination that it lacked subject matter jurisdiction to consider Video Only's arguments.
Reversal is not required, of course, because the trial court prudently considered the contentions anyhow, in the event that it really did have subject matter jurisdiction. And so we will turn to the merits of Video Only's contentions.

II
When adjudicating public use and necessity in a condemnation proceeding, Washington courts are required by Const. art. 1, § 16 to determine "whether the contemplated use is really public ... without regard to any legislative assertion that the use is public[.]" Video Only in effect contends that the contemplated use of its property is not "really public" within the meaning of the constitution, notwithstanding that Phase I of the project will be built on its property, because PFD lacks statutory and constitutional authority to operate the Shopping Center as an interim financing device to help fund the first two phases of the Lynnwood Convention Center project. Video Only's premise fails in that it is mistaken regarding the PFD's statutory and constitutional authority.
The PFD's statutory authority is found in Ch. 35.57 RCW. RCW 35.57.010(6) provides that a public facilities district may "acquire and transfer real and personal property by lease, sublease, purchase, or sale." RCW 35.57.020(1) authorizes a public facilities district to "acquire, construct, own, remodel, maintain, equip, reequip, repair, finance, and operate one or more regional centers." A "regional center" includes "a convention, conference, or special events center, or any combination of facilities, and related parking facilities[.]" Id. "A public facilities district may impose charges and fees for the use of its facilities[.]" RCW 35.57.020(3). To carry out the purposes of the chapter, a public facilities district may "issue general obligation *383 bonds" that are "payable from the operating revenues of the public facilities district in addition to the tax receipts of the district." RCW 35.57.030(1); (3). A public facilities district may also impose certain sales and use taxes for purposes of funding a regional center. RCW 35.57.040. For purposes of funding a regional center, the board of directors of a public facilities district may impose "[c]harges and fees for the use of any of its facilities" including "[v]ehicle parking charges[.]" RCW 35.57.040(1)(a); (c). "A public facilities district is a municipal corporation" and "shall possess all the usual powers of a corporation for public purposes" "including but not limited to, the authority to... enter into contracts[.]" RCW 35.57.010(4); (5)
Although nothing in the chapter authorizes a public facilities district to "operate a shopping center" as an interim financing device for the project, the statutory authority to "transfer real property by lease" and to "enter into contracts" necessarily includes the ability to collect rents as one of several permissible revenue-producing endeavors by which the district may finance the construction and operation of a regional center.
Moreover, a municipal corporation that has the authority to enter into contracts may purchase property with public monies with the intent of eventually reselling a portion of the property to private persons where a large portion of the property will be used for municipal purposes, and the purpose of the transaction is to ensure the continued viability of the municipal corporation. Such a purchase serves the public purpose of permitting the municipal corporation to grow to its optimum size and does not violate Const. art. 8, § 7, the provision in our state constitution that prohibits municipal corporations from lending credit in aid of any individual, association, company, or corporation, except for the necessary support of the poor and infirm. See United States v. Town of North Bonneville, 94 Wash.2d 827, 621 P.2d 127 (1980) (affirming the authority of the Town of North Bonneville to acquire property from the Corps of Engineers so that the town could be moved to accommodate the construction of a powerhouse project on the Columbia River, and so that the relocated town could grow to its optimum size when the municipality eventually sold lots for commercial and residential building purposes). As the Town of North Bonneville court observed, 94 Wash.2d at 833, 621 P.2d 127, "`What is a public municipal purpose is not susceptible of precise definition, since it changes to meet new developments and conditions of times.'" (Quoting 15 Eugene McQuillin, MUNICIPAL CORPORATIONS § 39.19 at 32 (3d ed.1970)).
By that same token, Washington's Stadium Act, Laws of 1995, 3d Spec. Sess., ch. 1, §§ 201(1) at 4 and 201(4)(b) at 5, did not run afoul of various state constitutional provisions when it authorized the imposition of certain sales taxes and the creation of a public facilities district empowered to "acquire, construct, own, remodel, maintain, equip, reequip, repair and operate a baseball stadium" that would be leased to a major league baseball team. See CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996). The Stadium Act provided a means by which the State and King County could generate revenues to be allotted to the public facilities district to defray the major portion of the costs of constructing the new stadium, conditioned on the major league tenant agreeing to share a portion of its profits with the public facilities district to help retire the bonds issued to finance construction of the stadium, and for other public facility district purposes thereafter. CLEAN, 130 Wash.2d at 790-91, 928 P.2d 1054. The Supreme Court held: (1) The Stadium Act does not violate Const. art 7, § 1, which provides that all taxes shall be levied and collected for public purposes only, in that the construction of a professional baseball stadium to be leased to a professional sports franchise for its use as a home field serves the public purposes of providing jobs and recreation for citizens and promoting economic development and tourism. The fact that the baseball team would also reap a profit is not fatal to the Act, as this is immaterial to determining whether legislation furthers a public purpose. 130 Wash.2d at 795-96, 928 P.2d 1054.(2) The Stadium Act does not violate Const. art. 8, §§ 5 and 7, which prohibit the gifting of public funds and the lending of *384 public credit. There was no gift because there was no donative intent, and because the public facilities district owns the stadium and the major league tenant pays reasonable rent. And there is no lending of credit because the public facilities district will continue to own the stadium, thereby receiving value for the expenditure of public money. 130 Wash.2d at 797-99, 928 P.2d 1054.(3) The Stadium Act does not violate Const. art. 8, § 7, which provides that no municipal corporation shall become directly or indirectly the owner of any stock in or bonds of any association, company or corporation, in that the profit-sharing arrangement provided in the Act is to secure funds to retire public debt, and not to make the public facilities district a direct or indirect investor in the professional baseball club. 130 Wash.2d at 800-801, 928 P.2d 1054.
In light of these and other cases discussed above, we see no constitutional impediment to the means chosen by the PFD in the instant case to help finance the construction and operation of the first two phases of the Lynnwood Convention Center project. The PFD did not acquire the Shopping Center by eminent domain; it acquired it by purchase. As we have seen, a municipal corporation may properly purchase more real property than it may need at the time of the purchase, for purposes of reasonable future expansion to optimum size. Town of North Bonneville, supra. So also may it utilize its contract powers to sell property to a private developer on condition that the developer follow architectural plans that are consistent with the municipal corporation's plans to condemn property for a public park that will lie adjacent to a previously planned urban retail center. Although the municipal corporation could not condemn the park property as part of a project that included an urban retail center, see Westlake I, it could accomplish the same overall objective through its contract powers, without tainting the validity of the subsequent condemnation for park purposes. See Westlake II.
A public facilities district may expend public funds to build a major league baseball stadium, and lease the stadium to a professional baseball club, and share in the club's profits, and utilize the rents and profits to retire general obligation bonds sold to finance the project, all without running afoul of various constitutional provisions. See CLEAN, supra. And it has long been the rule that a municipal corporation may acquire real property with public funds and lease surplus space to private parties until such time as the municipal corporation needs the space for municipal purposes, provided that the probable need for future space for municipal purposes is foreseeable from the outset. See AGO 53-55 No. 339. See also AGO 1978 No. 10 (A school district may lease its surplus space for private purposes until such time as the space is needed for school purposes, so long as a reasonable rent is charged, and so long as the district retains the right to retake possession when the space is again needed for school purposes; there is no purpose in requiring public property not presently needed for public use to lie idle when it could be leased, thus relieving the taxpayers of the cost of maintenance and upkeep on the property).
The trial court did not err when it concluded that the Shopping Center was acquired for a lawful public use, namely convention center parking and future expansion, and that until the property is needed for future expansion, the PFD may properly lease it out as an interim financing device for construction and operation of the regional center. Any other conclusion would require the property to lie fallow at public expense until Phase III of the project gets underway, and that would serve no public purpose whatsoever.
The trial court was also correct when it concluded that the interim operation of the Shopping Center does not taint the public use for which Video Only's land is being condemned. As illustrated by Westlake II, the PFD can lawfully contract with private individuals with respect to the Shopping Center without thereby tainting the acquisition by condemnation of Video Only's property for the purely public use of constructing the convention center and exhibition hall. And by analogy to Washington State Convention and Trade Center, the interim operation of the Shopping Center is only a means to an *385 end; it is not an end in and of itself. The PFD did not acquire the Shopping Center for the purpose of becoming a perpetual landlord of a shopping center. It acquired it to provide parking for Phases I and II of the project, and for eventual expansion and additional parking for Phase III of the project. The interim leasing of the property as an additional revenue source is incidental to the public use of the overall projecteven if the project could not be accomplished without that revenue source. Cf., Washington State Convention and Trade Center, 136 Wash.2d at 822, 966 P.2d 1252 (Where the government seeks to condemn no more property than would be necessary to accomplish purely the public component of the project, the participation by a private developer, although crucial to the financing of the overall project, is merely incidental).
In sum, the trial court did not err by rejecting Video Only's contentions and concluding that the contemplated public use of Video Only's land was "really public" notwithstanding the private component of the interim operation of the adjacent Shopping Center.

III
Video Only also challenges the necessity of the taking of its property on grounds of fraudulent behavior by the PFD. Unlike a determination of public use, which is purely a judicial question, a declaration of public necessity by a legislative body is conclusive in the absence of proof of actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud. Washington State Convention and Trade Center, 136 Wash.2d at 823, 966 P.2d 1252, citing City of Tacoma v. Welcker, 65 Wash.2d 677, 684, 399 P.2d 330 (1965). Video Only bases its challenge to the declaration of public necessity on all the same grounds as its challenge to public use. And the challenge fails, for all the same reasons discussed above. Nothing done by the PFD with respect to the Shopping Center rises to the level of fraud or constructive fraud; indeed, the PFD has proceeded lawfully in its acquisition of and interim operation of the Shopping Center. The Shopping Center is being operated in what is now a surplus of usable space. That area would lie vacant pending Phase III of the project, if it were not being rented out, which would serve no public purpose whatsoever, and which also would be fiscally stupid. On these facts, the trial court did not err in concluding that the legislative declaration of public necessity is binding on the court.

IV
The City of Lynwood seeks an award of attorney fees for defending this appeal, which it characterizes as frivolous. Although Video Only has not prevailed on the merits, its contentions regarding subject matter jurisdiction were correct. And as to the merits, Video Only raised debatable issues. We deny the City's request for attorney fees. But as the prevailing party, the City is entitled to recover its costs as provided under Title 14 of the Rules of Appellate Procedure.
Affirmed.
WE CONCUR: COX, A.C.J., and BAKER, J.
NOTES
[1] RAP 2.2(a)(4) provides that an order of public use and necessity in a condemnation case is appealable, although the issue of compensation may still be pending.
[2] Others include probate, quiet title actions, the status of marriage where the court has personal jurisdiction over one spouse but not the other, and escheat. See Tegland, Karl B., WASHINGTON PRACTICE SERIES, CIVIL PROCEDURE, § 5.1.