# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

THE CITY OF SEATTLE, a municipal corporation,

    Respondent,

v.

HUGH K. SISLEY and MARTHA E. SISLEY, husband and wife; HUGH K. SISLEY, individually and on behalf of their marital community;

    Appellants,

JOHN SANDIFER in his capacity as judgment creditor; ROOSEVELT DEVELOPMENT GROUP, LLC, a Washington limited liability company, in its capacity as lessee; ROOSEVELT DEVELOPMENT GROUP, LLC (RDG, LLC), a Washington limited liability company by Jonathan Breiner, managing member, in its capacity as lessee; and KING COUNTY, a subdivision of the state of Washington,

    Additional Respondents.

No. 76114-5-I

UNPUBLISHED OPINION

FILED: February 12, 2018

VERELLEN, C.J. — Hugh and Martha Sisley challenge the superior court decree of public use and necessity supporting the condemnation of their property (the property) by the City of Seattle (City). Specifically, they contend the City's selection of the property in the Roosevelt neighborhood for a park was a pretext borne out of animus arising from legal disputes with the City.

The Seattle City Council (City Council) reviewed reports and heard public comment about the proposed acquisition, and the trial court reviewed the evidence and held a hearing. Because there is no evidence or allegation that the City condemned the property for private use or to block another lawful use and the facts and circumstances support a genuine need for public park space in Roosevelt, the Sisleys' allegations of animus do not establish actual or constructive fraud amounting to arbitrary and capricious conduct. The City is not required to establish a lack of other viable alternatives for park space.

The Sisleys argue the court's restrictive discovery rulings frustrated their efforts to document the level and extent of animus and bad faith. But the trial court has broad discretion to narrow discovery requests. Restricting discovery to the contemplated acquisition of the property, including the criteria used for selecting the property and whether the City followed the criteria was within the discretion of the trial court.

Therefore, we affirm.

## FACTS

The City considers the Roosevelt neighborhood in northeast Seattle an "underserved community that lacks enough quality open space for public use."[1] The City has identified the need for more park space in Roosevelt dating back to neighborhood plans developed in 1998 and a gap report in 2006.

---

[1] Clerk's Papers (CP) at 357.

Chip Nevins, the City's Department of Parks and Recreation (DPR) acquisition planner, worked with the Roosevelt community to identify possible park spaces. Roosevelt community members and the neighborhood association met with DPR and discussed adding park space to preserve Roosevelt High School's view corridors. The City upzoned the Roosevelt neighborhood to allow for increased density. Sound Transit is scheduled to open a new light rail station in the neighborhood in 2020.

As part of city-wide planning, DPR prepared a 2011 development plan and a 2011 gap update report reflecting Roosevelt's planned density increase and the lack of sufficient park and open space. In January 2012, the City Council passed Resolution 31347, which declared the City's intent "to promote and enhance the livability" of Roosevelt in the face of new development and to further "livability, social equity, and neighborhood revitalization."[2]

In 2015, the City allocated funds to address Roosevelt's park needs and the goal of increasing green space and livability in view of increasing density and urbanization.[3] Nevins evaluated areas in Roosevelt as potential park sites. He consulted the 1998 Roosevelt neighborhood plan, the 2011 development plan, the 2011 gap report, and Resolution 31347. Nevins used the general criteria that DPR considers when evaluating potential park space such as does a potential park space service an identified gap in park space within a neighborhood, is it on a

---

[2] CP at 71-76.

[3] A portion of the funding was contemplated to come from several judgments against the Sisleys totaling approximately $3,000,000.

pedestrian route, is it relatively flat with good solar access, etc. Additionally, the City prioritizes underutilized and non-contaminated sites. Nevins and DPR concluded the property satisfied the criteria.

On September 25, 2015, a committee of the City Council met to consider acquiring the property for a public park through Council Bill 118509. The committee heard public comment and discussed e-mails from community members and information it received from the Roosevelt Neighborhood Association regarding the proposed park. The committee also heard from Ben Noble, the City's budget director, and DPR representatives about Roosevelt's historical open space and park needs, the impact of the planned light rail station, the anticipated increase in density, and DPR's selection of the property as a park site. The committee discussed the City's competing policy goals to provide open space and affordable housing given increasing neighborhood density, and how acquiring the property for a park would foster the former goal. The committee unanimously passed the council bill for consideration by the full City Council.

On October 5, 2015, the full City Council heard public comment regarding the proposed acquisition. The Sisleys did not attend the meeting. Community members expressed support. The City Council unanimously adopted the ordinance that the property "be acquired for open space, park, and recreation purposes for the City through negotiations and the use of eminent domain (condemnation) if necessary."[4]

---

[4] CP at 359.

The City's attempts to negotiate with the Sisleys failed, and the City initiated this condemnation action.

The City filed a public use and necessity application. The Sisleys propounded extensive discovery which focused on the City's collection of its judgments against them. The Sisleys requested discovery regarding (1) a voter-approved funding mechanism for Seattle parks unrelated to this condemnation, (2) other Sisley-owned properties, (3) all communications regarding the property, and (4) other conduct by and court judgments against the Sisleys. The Sisleys also noted six depositions, including that of Mayor Edward Murray.

The City provided responses and objections to the Sisleys' written discovery, produced documents, and made Chip Nevins available for deposition.

The court granted the City's motion for a protective order and denied the Sisleys' motion to compel. The court observed:

> The scope of discovery in this matter (including depositions) with respect to the Court's assessment of public use and necessity is and shall be limited to the contemplated acquisition of the Sisleys' property for a public park pursuant to Council Bill 118509 and Ordinance 124880.[5]

The court ruled the Sisleys were not entitled to depose Mayor Murray or parks personnel other than Nevins. The Sisleys served additional discovery requests similar to their initial requests. The day after the City provided responses and objections, the Sisleys propounded more discovery, noting four depositions of City employees, officials, and a member of the board of park commissioners. The

---

[5] CP at 576.

Sisleys made a subsequent request for information relating to the City's 2000 and 2008 parks levies. The trial court granted the City's motion for a second protective order. The order prohibited "any further discovery, including depositions, regarding or relating to public use and necessity without prior court authorization."[6]

Four days before the scheduled public use and necessity hearing, the Sisleys issued six subpoenas commanding Mayor Murray, an assistant city attorney, and four others to testify at the hearing. The City filed a motion to quash the subpoenas. The court granted the motion in part, allowing the Sisleys to call Nevins as a witness with his testimony limited to

> matters within his personal knowledge that strictly relate to the three part test enunciated in Petition of City of Seattle, 96 WA.2d 616, 625 (1981): (1) whether the use is really public, (2) whether the public interest requires it, and (3) whether the property appropriated is necessary for the purpose.[7]

The court held an evidentiary hearing. The City presented an excerpt of the video recording of the City Council's October 5 meeting. The City also confirmed, through Nevins' live testimony, (1) the entire property will be used for a public park, (2) it is a flat and vacant lot adjacent to Roosevelt High School, (3) using the property as a public park will preserve view corridors of that neighborhood landmark, and (4) it will also help satisfy a longstanding and documented need for additional park and open space in the area.

On November 21, 2016, King County Superior Court entered findings and ordered that "the proposed acquisition is for a public use, is in the public interest

---

[6] CP at 987.

[7] CP at 1363.

6

and that the acquisition is necessary to serve the public use."[8] The court ordered the matter of just compensation to proceed to trial.

The Sisleys appeal.

ANALYSIS

## I. Public Use and Necessity Decree

The Sisleys contend the public use and necessity decree was arbitrary, a result of bad faith, collusion, and fraud.

To enter a decree of public use and necessity, a court must find the contemplated use of the property is really a public use, public interest requires the public use, and the property to be acquired is necessary to facilitate this public use.[9] "The question of whether the use is really a public use is a judicial determination."[10] But "a legislative declaration will be accorded great weight."[11]

The necessity determination is a legislative question, and a "declaration of necessity by a legislative body is 'conclusive in the absence of proof of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud.'"[12] Arbitrary and capricious conduct is "willful and unreasoning action,

---

[8] CP at 1648.

[9] Public Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., LLC, 159 Wn.2d 555, 573, 151 P.3d 176 (2007).

[10] Id.; WASH. CONST. art I, § 16.

[11] City of Des Moines v. Hemenway, 73 Wn.2d 130, 133, 437 P.2d 171 (1968).

[12] N. Am. Foreign Trade Zone Indus., 159 Wn.2d at 575-76 (quoting HTK Mgmt., L.L.C. v. Seattle Popular Monorail Auth., 155 Wn.2d 612, 629, 121 P.3d 1166 (2005)).

without consideration and regard for facts or circumstances."[13] "A condemnation of private property is necessary if it is 'reasonably necessary' under the circumstances."[14] A particular condemnation is necessary as long as it appropriately facilitates a public use

> when there is a reasonable connection between the public use and the actual property, this element is satisfied. It need not be the best or only way to accomplish a public goal. [Our Supreme Court] has held already that the "mere showing" that another location is just as reasonable does not make the selection arbitrary and capricious.[15]

For fraud or constructive fraud in this setting, there must be evidence showing

> the public use was merely a pretext to effectuate a private use on the condemned lands. . . . [S]ome relevant considerations are the dollar contribution of the private party, the percentage of public versus private use, and whether the private use is occurring in an architectural surplus of usable space.[16]

Where the trial court has weighed the evidence supporting public necessity, we review the record to determine only whether the factual findings are supported by substantial evidence.[17] "Substantial evidence is viewed in the light most

---

[13] State v. Hutch, 30 Wn. App. 28, 35, 631 P.2d 1014 (1981).

[14] N. Am. Foreign Trade Zone Indus., 159 Wn.2d at 576 (internal quotation marks omitted) (quoting Seattle Popular Monorail Auth., 156 Wn.2d at 636 n.19).

[15] Cent. Puget Sound Transit Auth. v. Miller, 156 Wn.2d 403, 421, 28 P.3d 588 (2006) (quoting State ex rel. Hunter v. Superior Court, 34 Wn.2d 214, 219, 208 P.2d 866 (1949)).

[16] State ex rel. Wash. State Convention and Trade Ctr. v. Evans, 136 Wn.2d 811, 823, 966 P.2d 1252 (1998).

[17] Miller, 156 Wn.2d at 419.

favorable to the respondent and is evidence that would 'persuade a fair-minded, rational person of the truth of the finding.'"[18]

The Sisleys do not dispute that a public park constitutes a valid public use.[19] The Sisleys suggest it was not necessary because there were other better suited areas for this project. But "[i]t need not be the best or only way to accomplish a public goal."[20]

And there is a reasonable connection between the public use of a park in Roosevelt's core and the property. The property is a flat vacant lot immediately south of Roosevelt High School, within walking distance from the planned light rail station. The City's report, public comment, and City Council's remarks indicate the use of the property as public park space will serve a recognized gap in Roosevelt park space, further the City's commitment to provide more park and open space, and provide an important public amenity for the neighborhood.

The Sisleys argue the City engaged in fraud, specifically, "the entire taking was a pretext borne out of animus."[21] But fraud in this setting relates to a pretext for a private use.[22] The ordinance describes the need for additional park space in Roosevelt, explains the property's qualifications to be a "new neighborhood park,"

---

[18] Id. (quoting State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)).

[19] See RCW 8.12.030 (authorizing Washington municipalities to "condemn land and property" for a wide range of public uses, including "public parks").

[20] Miller, 156 Wn.2d at 421.

[21] Reply Br. at 11.

[22] See Evans, 136 Wn.2d at 823 ("Fraud or constructive fraud would occur if the public use was merely a pretext to effectuate a private use on the condemned lands.").

9

and provides for acquisition of the property to "be placed under the jurisdiction of [DPR] and designated for open space, park, and recreation purposes."[23] The Sisleys suggest this was "a dispute pertaining to 'public necessity,' largely arising out of private benefit being conferred,"[24] but do not identify any private benefit. There is no showing of actual fraud.

The Sisleys also suggest the City engaged in constructive fraud, but do not establish arbitrary and capricious conduct amounting to constructive fraud.

In view of the voluminous evidence documenting the need for parks and open space in the increasingly dense neighborhood, the City's contemplated acquisition of the property is consistent with reasoned action with regard to the facts and circumstances and therefore is not arbitrary or capricious.

The Sisleys' arguments about the City's animus are not compelling. In State v. Hutch, a community college installed lights on its baseball field.[25] The lights shined into Mrs. Hutch's adjacent property, and she sued the college for injunctive relief and damages.[26] The college offered a settlement and told Hutch if she did not settle, it would initiate condemnation proceedings to take her property.[27] Hutch rejected the offer. The State Board passed a resolution

---

[23] CP at 6-8.

[24] Appellant's Br. at 18.

[25] 30 Wn. App. 28, 30, 631 P.2d 1014 (1981).

[26] Id.

[27] Id. at 30-31.

10

authorizing condemnation, but the trial court found the primary motivation behind the condemnation action was to settle the lighting system dispute with Hutch.[28]

Division Two of this court acknowledged the motive may well have been to pressure Hutch into a settlement, but noted "the underlying motive of a condemnor is of limited utility in determining *whether the condemnor has acted arbitrarily and capriciously*."[29] The court recognized that "any attempt to focus on the motives underlying a condemnation request *presents the dilemma of deciding whose motive is determinative*."[30] The court reasoned the proper inquiry is to focus on the facts and circumstances of the condemnor's request and, even if motivated in part by improper considerations, "if examination of the facts and circumstances of proposed condemnation *demonstrates a genuine need and if in fact the condemnor intends to use the property for its avowed purpose*, the condemnor's action cannot be arbitrary and capricious."[31] This continues to be the prevailing approach in Washington.[32]

---

[28] Id. at 36.

[29] Id. at 37 (emphasis added).

[30] Id. at 38 (emphasis added).

[31] Id. (emphasis added).

[32] See N. Am. Foreign Trade Zone Indus., 159 Wn.2d at 577-78 (acknowledging that motivation to install generators on condemned property was, in part, to maximize profits from energy sales, but the record also contained "ample evidence that the generators were purchased in response to a real energy crisis" and the government entity was "acting primarily to protect its ability to provide energy to its customers"); Miller, 156 Wn.2d at 418 ("Even if the decision was partially motivated by improper considerations, it will not be vacated so long 'as the proposed condemnation demonstrates a genuine need . . . and the condemnor in fact intends to use the property for the avowed purpose.") (quoting In re Petition of Port of Grays Harbor, 30 Wn. App. 855, 864, 628 P.2d 633 (1982)).

The Sisleys argue such a standard promotes the misuse of condemnation powers. We disagree. The standards governing public use and necessity reflect deference to the legislative decisions underlying the selection of property for condemnation. Such deference is not unwarranted.

The Sisleys suggest the condemnation was based entirely on the City's ulterior motives, to collect a debt owed to the City, to "score political points," and act with "animus" towards the Sisleys.[33] But as discussed, there is ample evidence the City talked to and engaged with members of the community and applied its criteria for parks.[34] The Sisleys rely on several cases from other jurisdictions, but those cases are not helpful in this setting.[35]

---

[33] Appellant's Br. at 20.

[34] The Sisleys contend Nevins departed from the normal procedure, for example, by skipping the step of considering contamination. But the testimony they rely on reveals merely that Nevins did not know of any environmental impact statements or declarations of nonsignificance done for any properties acquired for neighborhood parks. See CP at 764. EIS and declarations of nonsignificance are not the exclusive means to determine whether property is contaminated. Nevins testified the general criteria, including priority given to property that is not contaminated, were satisfied. And the Sisleys offered no evidence that their property was contaminated.

[35] City of Miami v. Wolfe, 150 So.2d 489 (Fla. Dist. Ct. App. 1963) (Florida appellate court affirmed dismissal of condemnation where the record showed the City was not actually going to use the acquired land for the proposed purpose); Pheasant Ridge Assocs., Ltd. v. Town of Burlington, 399 Mass. 771, 506 N.E.2d 1152 (Mass. 1987) (the record did not show the property would be actually used for the avowed public use of a park or for affordable housing); City of Freeman v. Salis, 630 N.W.2d 699 (S.D. 2001) (South Dakota Supreme Court held "[a] choice to condemn must grossly violate fact and logic or be wholly arbitrary to support a finding of abuse" sufficient to dismiss a condemnation petition); Carroll County v. City of Breman, 256 Ga. 281, 347 S.E.2d 598 (Ga. 1986) ("the use put forth by the county is a public purpose, but there is evidence that the actual purpose was to stop another use, also public, but one which the county officers oppose"); Borough of Essex Fells v. Kessler Inst. for Rehab., 289 N.J.Super. 329, 673 A.2d 856, 858 (N.J. Super. Ct. Law Div. 1995) (city purported to condemn land to use as a public

We conclude the public use and necessity determination is supported by substantial evidence. There is no showing of fraud or constructive fraud.

## II. Discovery Limitations

The Sisleys contend the trial court erred in denying discovery "probative to the City's bad faith and arbitrary conduct."[36]

We review the trial court's discovery orders for abuse of discretion.[37] The trial court has broad discretion to manage the discovery process and limit the scope of discovery.[38] CR 26(c) "'was adopted as a safeguard for the protection of parties and witnesses in view of the almost unlimited right of discovery given by [CR] 26 (b)(1). The provision emphasizes the complete control the court has over the discovery process.'"[39]

The Sisleys contend an internal memorandum should have been produced, but, as clarified at oral argument, the Sisleys did not request in-camera review by

---

park, but admitted all of its park needs had been met by another acquired property, the city used the condemnation to block another use on the property); Denver W. Metro Dist. v. Geudner, 786 P.2d 434, 436-37 (Colo. Ct. App. 1989) (Colorado appellate court concluded there was substantial evidence in the record to support the trial court's conclusion that the essential purpose underlying the District's decision to condemn was to further private interests).

[36] Appellant's Br. at 28.

[37] City of Lakewood v. Koenig, 160 Wn. App. 883, 892, 250 P.3d 113 (2011).

[38] Dalsing v. Pierce Cty., 190 Wn. App. 251, 262-66, 357 P.3d 80 (2015).

[39] Id. at 262 (alteration in original) (quoting 8A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2036 (2010)).

the trial court.[40] The Sisleys also argue they were denied a meaningful opportunity to depose Nevins because the City instructed him to not answer on several occasions, but the Sisleys did not pursue those refusals with the trial court.

Here, the trial court focused on whether the use sought is public, whether the property reasonably facilitated that use and, if so, whether the selection of the property through the legislative process was fraudulent or arbitrary and capricious, constituting constructive fraud. The City provided interrogatory responses and documents and produced Nevins for deposition. The Sisleys had a reasonable opportunity to explore the criteria used, the information relied upon to support the criteria, how past studies and planning document the need for a park, and how this property fits that need.

We conclude the trial court did not abuse its discretion when it limited the scope of discovery to "the contemplated acquisition of the Sisleys' property for a public park pursuant to Council bill 118509 and Ordinance 124880."[41]

The Sisleys contend the community statements were inadmissible double hearsay, but the City properly conducted open public comment periods to gauge public support and address concerns regarding the property. The Sisleys neither offer authority barring evidence of public comments taken as part of the public use and necessity process, nor explain specifically how such public comments offend

---

[40] We do not have before us any version of such a memorandum called to the attention of the trial court.

[41] CP at 576.

the hearsay rule limiting testimony offered to prove the truth of the matter asserted.[42]

We conclude the Sisleys had a meaningful opportunity to be heard. Therefore, we affirm.

WE CONCUR:

_____

Becker, J.

_____

Leach, J.

---

[42] ER 801(c); Sisley v. Seattle School Dist., 171 Wn. App. 227, 232-33, 286 P.3d 974 (2012).